The STATE of Ohio, Appellee,

v.

SOKE, Appellant.

[Cite as *State v. Soke* (1995), 105 Ohio App.3d 226.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 65120.

Decided July 17, 1995.

228

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Carl Wetzel,* Assistant County Prosecuting Attorney, for appellee.

*David L. Doughten* and *Thomas M. Shaughnessy,* for appellant.

PATTON, Chief Justice.

A jury found defendant Theodore Soke guilty of two counts of aggravated murder with specifications in violation of R.C. 2903.01 and one count of aggravated burglary in violation of R.C. 2911.11. Following the penalty phase of the trial, the jury concluded that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt and recommended that the court impose a sentence of death on the aggravated murder counts. The court accepted the jury's recommendation and sentenced defendant to death on the two counts of aggravated murder and to a term of ten to twenty-five years on the aggravated burglary count. Defendant appeals.

On May 19, 1985, family members found the bodies of Dorothy and Phillip Porter at their home in Shaker Heights. Eighty-four-year-old Phillip Porter had been stabbed twice in the back. He lay face down in his upstairs bedroom, straddling his bed. Seventy-eight-year-old Dorothy Porter lay face down on the basement floor. She had been stabbed, beaten, and strangled with the cord of an electric iron.

The coroner estimated that the Porters had been dead for at least thirty-six hours when he examined the bodies on May 20, 1985, although he could not pinpoint the exact time of death with certainty. A Porter family friend testified that she had visited the Porters between five and seven o'clock on the evening of May 17, 1985. Dorothy Porter's daughter testified that she tried to call her mother between seven and eight o'clock on the seventeenth, but received a busy signal. Both the family friend and the daughter unsuccessfully tried to call the Porters throughout the weekend. On Sunday, May 19, the daughter asked her son to check on the Porters. The son saw a newspaper in the driveway and noticed that the house lights were off. When the Porters did not come to the door, he obtained a key to the locked house and, with the help of a neighbor, entered the house and found the bodies.

The police determined that the assailants had entered the house by poking holes through a kitchen window screen. They apparently left through the same window, since all the doors to the house were locked from the inside.

Consistent with the Porters' nightly routine, the police found a thermos, glass and plate of uneaten crackers on the nightstand in Phillip Porter's room, and Dorothy Porter's unfinished milk and brandy in the kitchen. These discoveries led the police to believe that the Porters had been surprised by their assailants.

Although the telephone had been removed from the hook, the Porter house had not been "tossed" in a manner consistent with a burglary. The police found a closed and apparently untampered-with wallet on a kitchen counter.

The police began an intensive investigation but were unable to identify the murderers. They failed to uncover any incriminating physical evidence at the crime scene. Dried blood stains suggested that Dorothy Porter had been stabbed on the first floor, dragged across a hallway and down a flight of stairs leading to the basement. Her fingers bore cuts indicating she had tried to defend herself from her assailants. Other dried blood droplets found on the stairs most likely fell off a knife as it was carried back up the stairs. A lack of matching blood enzymes indicated that the Porters had been stabbed with different knives. The assailants left no fingerprints or semen, and fingernail scrapings proved inconclusive.

In 1989, Lake County officials began investigating Donald Soke, defendant's son, for the murder of Karen LaSpina in Eastlake. During the course of that investigation, the police began to suspect that defendant, his son, and a man named Daniel Crawford may have been involved in the Porter murders after they learned that all three men had told fellow prison inmates about their complicity in the Porter murders.

The Cuyahoga County Grand Jury indicted all three on aggravated murder charges for the Porter killings. Defendant submitted to trial before a three-judge panel. Donald entered a guilty plea to two counts of aggravated murder and testified against his father. Crawford entered a guilty plea to one count of aggravated burglary and also testified against defendant. The panel found defendant guilty and sentenced him to two consecutive life terms.

After sentencing, defendant filed a motion for a new trial. Asserted as grounds for the motion were, among other things, that defendant's son Donald Soke fabricated testimony against him, that the state reneged on a promise to Donald Soke in which it agreed not to seek the death penalty against defendant in exchange for Donald's testimony, and that Donald fabricated his testimony with the aid of a written police report he saw prior to making a formal written statement.

The panel unanimously granted the motion for a new trial. In an oral ruling, the panel stated:

"The fact that Donald Soke had in his possession an initial crime scene investigation is nothing short of astounding. * * * [N]ot one member of this distinguished panel * * * can ever recall a report of this nature being produced at trial, let alone given into the possession of a witness. The reason is obvious, and it is to prevent a situation just as the one we have here now. One of the few

credible things about the testimony of Donald Soke was his knowledge of information that, quote, only the murderer could know. And that is now given a new dimension. He, Donald, had the ability and the opportunity to plot with Dan Crawford, who got the most incredible plea bargain of anyone in this case. For whatever reason, they, Danny and Donny, have been constantly kept together during the pendency of this matter."

Before the second trial began, Donald Soke recanted his testimony implicating defendant.[1] Neither side called him as a witness during the guilt phase of the second trial, although he did testify in defendant's behalf during the penalty phase.

Daniel Crawford testified that he and Donald Soke were friends. They met on the morning of May 17, 1985 and drove Crawford's car around trying to find money for marijuana. They were unsuccessful, so they rode in Crawford's car to the city of Fairport Harbor, where Soke's grandmother lived. While at her house, they met up with defendant. The three began drinking and decided to drive to Mayfield, where Donald collected some money that a friend owed him. The three men and Donald's friend drove to a bar in Euclid and spent the day drinking and shooting pool. When the money ran out, defendant suggested that they drive to Cleveland and burglarize a house.

Crawford testified that he and Donald had burglarized many houses according to a general plan. They waited until dusk and looked for a house with no lights on inside. They would knock on the door, and if someone answered they would make up a name and ask if that person was home. If the house was empty, they would break into it.

They dropped off Donald's friend and began looking for a house to burglarize. Around dusk, Crawford picked out a house which he later identified to the police, who confirmed it as the Porter residence. They did not have gloves to wear so they put band-aids on their fingers. Crawford stated that defendant carried a sheathed knife, but could not identify a knife shown him at trial. Crawford and Donald went to the front door while defendant stayed behind with the car. When no one answered the front door, they tried knocking at the back door. When no one answered the back door, Crawford punched holes in a window screen and entered the house through the window. They went to the front door and let defendant into the house.

---

1. Donald Soke later sought to withdraw his guilty pleas to the Porter murders. He claimed to have fabricated his testimony against defendant and challenged the juvenile court's relinquishment of jurisdiction for purposes of criminal prosecution. This court affirmed the trial court's refusal to permit a withdrawal of the guilty plea, finding Donald's waiver of personal jurisdiction was not a fatal defect which invalidated his guilty pleas. *State v. Soke* (July 15, 1993), Cuyahoga App. No. 62908, unreported, 1993 WL 266951.

Crawford looked for goods on the first floor of the house while defendant went upstairs. Crawford stated that he heard defendant yell for Donald to come upstairs. A woman screamed and Crawford ran from the house to the car. When Donald and defendant failed to show at the car, Crawford panicked and fled on foot. He eventually hitchhiked home to Lake County.

Crawford made his way back to the house owned by Donald's grandmother and saw his car parked there. Donald gave Crawford the keys to his car and told him to leave the house. He met Donald several days after the burglary and received a diamond ring as his proceeds from the burglary. Although he knew something had gone wrong during the burglary, Crawford testified that he was unaware the Porters had been murdered. He discovered that fact in subsequent conversations with Donald Soke.

Crawford testified that he met defendant in late 1987 or early 1988 while they were both incarcerated in Mansfield. Defendant asked Crawford what he knew about the Porter murders and Crawford replied that Donald had told him that two people died. Crawford told defendant that he had not been questioned about the murders. Defendant told Crawford to keep quiet about what he knew.

Defendant later discovered that the police had questioned Crawford, and he warned Crawford not to implicate him in the murders. At first, Crawford gave conflicting statements to the police, supposedly to delay investigation. However, after he pleaded guilty to one count of aggravated burglary in connection with the Porter slaying, his testimony implicating defendant became more consistent.

The state presented testimony from several prison inmates who testified that they had overheard defendant acknowledge his complicity in the Porter murders. One inmate testified that defendant was concerned Donald might implicate him in the murders. Defendant told the inmate that he had to "off" the Porters. Defendant also told the inmate that Crawford had been present, but did not participate in the murders. Another prison inmate testified that defendant became concerned Donald would implicate him in the Porter murders by telling the police that he stabbed Phillip Porter. Defendant indicated that he would have his son killed before he could be implicated.

A third inmate testified that he overheard defendant tell a group of inmates that he had murdered the Porters to avenge damning newspaper coverage of his friends. Phillip Porter worked at the Plain Dealer and at some point the paper published articles about a murder trial involving his friends who were members of a local motorcycle club. Defendant said that the articles made his friends appear guilty before the trial, so he murdered Phillip Porter as a favor to his friends. Defendant told the inmates that he purposely chose to burgle the Porter house

and that neither Donald Soke nor Daniel Crawford knew the real reason behind the burglary.

The defense offered several exhibits into evidence and rested.

## I

Defendant's first assignment of error is that the trial court abused its discretion by failing to allow an individual sequestered voir dire as to the question of publicity. Defendant maintains that prospective jurors were exposed to pretrial publicity that may have informed them of defendant's first trial and conviction for the Porter murders. He argues that curative instructions and juror assurances of impartiality could not overcome the prejudicial impact this information had on the jury's verdict.

The determination whether a voir dire in a capital case should be conducted in sequestration is a matter of discretion within the province of the trial judge. *State v. Mapes* (1985), 19 Ohio St.3d 108, 19 OBR 318, 484 N.E.2d 140, paragraph three of the syllabus. A criminal defendant has no constitutional right to question prospective jurors individually as to the content of news reports to which they had been exposed. *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424–426, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493, 504–506. As long as the trial judge is satisfied that prospective jurors can set aside the content of news reports and render a fair verdict based on the evidence, no abuse of discretion will be shown. *Id.* at 430–432, 111 S.Ct. at 1908, 114 L.Ed.2d at 508–510.

In this case, several prospective jurors acknowledged hearing or reading news reports concerning the trial. All of those prospective jurors, however, stated that they could render a verdict on the evidence without the knowledge of news reports affecting their verdict. The trial judge did not sequester the prospective jurors during the venire, but he did allow the parties to question them without limitation on inquiry. The transcript of the proceedings show that defense counsel engaged in full and unlimited questioning concerning the pretrial publicity. The parties agreed to remove one prospective juror based on her statement that she could not put aside her exposure to pretrial publicity and render a fair verdict. Under these circumstances, we cannot say that the trial judge abused his discretion. The first assignment of error is overruled.

## II

The second assignment of error is that the trial court erred by failing to dismiss a prospective juror after she stated that she could not be fair and impartial in view of the pretrial publicity.

The court dismissed the prospective juror upon joint motion of the parties.[2] Following the verdict, the court polled the jurors and inadvertently called the name of the dismissed juror. Our review of the verdict forms shows the prospective juror in question did not sign the verdicts, nor was she a member of the empaneled jury. The trial judge simply misspoke. The second assignment of error is overruled.

## III

The third assignment of error complains that the trial judge twice unduly restricted defendant's cross-examination. Following Daniel Crawford's direct testimony, defendant tried to impeach Crawford with incriminating statements that Crawford had made in taped jailhouse telephone conversations with Donald Soke. Defendant also sought to recall witness Martin Gladding after learning that he had voluntarily testified on behalf of the state in another criminal matter.

## A

During the cross-examination of Crawford, the defense sought to impeach his testimony by playing tape recordings containing conversations between Crawford and Donald Soke. The tapes had been made by Donald's wife at his request while he was being held in the county jail and Crawford was being held in the Shaker Heights jail. The wife placed conference calls in order to circumvent restrictions that both jails had placed on Crawford's and Donald's incoming telephone calls.

The tapes contain over four hours of conversations. Parts of those conversations include Donald's determined attempts to draw out Crawford's admission that he and Donald had fabricated not only their involvement in the Porter murders, but defendant's involvement as well. The trial court refused to allow defendant to use the tapes for impeachment purposes, but did allow the defense to proffer the tapes into evidence.

Defendant argues that the statements contained in the tapes were admissible under Evid.R. 613(B) as extrinsic evidence of prior inconsistent statements. Evid.R. 613(B) provides:

---

2. The transcript shows the following:

"MR. SHAUGHNESSY: I won't abuse you anymore. That being the case, let me join in with the prosecuting attorney and we'll ask that the juror be dismissed for cause.

"MR. HUDSON: Prosecuting attorney will join in with Mr. Shaughnessy.

"* * *

"THE COURT: Thank you. When you go out you have to go to the desk."

"Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded a prior opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(D)(2)."

When extrinsic evidence of a prior inconsistent statement is offered into evidence pursuant to Evid.R. 613(B), a foundation must be established through direct or cross-examination in which (1) the witness is presented with the former statement; (2) the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposition party is given an opportunity to interrogate the witness on the inconsistent statement. *State v. Theuring* (1988), 46 Ohio App.3d 152, 155, 546 N.E.2d 436, 439. "If a witness denies making the statement, a proper foundation has been laid, and the evidence does not relate to a collateral matter, extrinsic evidence is admissible." *State v. Riggins* (1986), 35 Ohio App.3d 1, 3, 519 N.E.2d 397, 401. The decision whether to admit a prior inconsistent statement which is collateral to the issue being tried and pertinent to the credibility of a witness is a matter within the sound discretion of the trial judge. *State v. Cornett* (1992), 82 Ohio App.3d 624, 635, 612 N.E.2d 1275, 1282–1283; *State v. Riggins, supra; State v. Bobo* (1989), 65 Ohio App.3d 685, 694, 585 N.E.2d 429, 434.

We note that the tapes contain over four hours of taped conversations not only between Donald and Crawford, but between Donald, his wife and law enforcement officials. The vast majority of the recordings contain extraneous matter not relevant for impeachment purposes. In fact, most of the conversations relate to, among other things, jailhouse activities and disparaging remarks about other inmates, counsel for the parties and law enforcement officials associated with the investigation of the case. The relevant material for impeachment purposes constituted only a very small portion of the taped conversations.

Prior to its attempt to use the tapes for impeachment, the defense made no effort to excise the extraneous matter from the tapes. Quite the contrary, we conclude that the defense sought to play all of the tapes to the jury, not so much for impeachment purposes, but as substantive evidence. Two reasons support our conclusion.

First, the record fails to show that the defense apprised the trial court of its intent to use the tapes at trial, even though the tapes had been made at least one year prior to the second trial. Defense counsel must have had sufficient time to prepare the tapes because they were able to prepare transcripts in advance of Crawford's cross-examination. Despite this opportunity, the defense did not seek any prior ruling on the use of the tapes. As the state noted, the defense came in

with transcripts and tapes that had not been authenticated. When defense counsel asked Crawford if he had ever told Donald that "the truth couldn't come out that day," there was no present indication that the defense was prepared to skip over the hours of irrelevant material and go directly to that quote.

We recognize that a party has no obligation to present impeachment material to the trial court before using it on a witness. However, when it seeks to use transcripts of tape recordings, it must first obtain prior approval of the court if the accuracy of the transcripts is challenged. Cf. *State v. Waddy* (1992), 63 Ohio St.3d 424, 445–446, 588 N.E.2d 819, 835–836. In this case, defense counsel read from a transcript of the conversations that had not been approved by the trial judge, much less seen by the state. The state objected because a foundation had not been laid to show who had made the tapes and whether the voices on the tapes were in fact those persons listed by the defense. Since it would have been a simple matter for the defense to make even the most minimal preparations in anticipation of using the tapes, we must conclude that defendant fully hoped the trial court would allow him to play the tapes in their entirety.

Second, the defense made no prior effort to edit the extraneous material, nor did it ask the trial judge to conduct an *in camera* inspection of the tapes prior to the point at which it sought to use the tapes for impeachment purposes. To be sure, the defense did offer to voir dire those persons involved with the tapes. That was an empty gesture, however, because the defense's offer to voir dire the tapes went only to authenticating the tapes, not editing them.[3]

The trial judge correctly restricted Crawford's cross-examination to those matters that were relevant for impeachment. At no time did the defense seek a continuance to edit the tapes or indicate that it had any other option to pursue. With no showing that the court could in fact play only those few relevant portions of the tape, the trial court did not abuse its discretion by restricting Crawford's cross-examination. Again, we must conclude that defendant had no intention of restricting his use of the tapes solely for impeachment purposes, but intended to use them for substantive evidence.

Notwithstanding the trial court's restriction on using the tapes, our review of the tapes and Crawford's cross-examination satisfies us that defendant had a full and fair opportunity to question Crawford on the broad subject matter of the tapes. The trial court gave defense counsel more than sufficient leeway to ask questions that encompassed issues of credibility. For example, Crawford admitted that he had lied to the police and the grand jury. His plea bargain with the state was thoroughly explored, including the rejection of the state's request for

---

3. The state later stipulated to the authenticity of the tape recordings when defendant proffered them into the record, but maintained its objection to their admissibility.

the minimum sentence on the reduced charge of burglary in exchange for Crawford's testimony.[4] The defense asked several questions concerning Crawford's conditions in jail, including his drug use and escape attempts.

It is significant, for purposes of this assignment of error, that Crawford not only knew that Donald had been taping their conversations, but that he himself had been surreptitiously taping his conversations with other persons. So it is not coincidental that a careful review of the tapes reveals no statement by Crawford where he explicitly admits falsely accusing defendant. This is not from Donald's lack of effort. Over a three-day period Donald is unable to elicit any statement where Crawford explicitly declares that he participated in a scheme to frame defendant. At one point, an exasperated Donald asks Crawford if he can tape their conversation as "insurance on what you're telling me. Would you say on tape the truth. You, me and Ted weren't there?" Crawford refuses, saying, "I'm not gonna talk on the phone, you know that, man." Still later, Donald tries again:

"Don: And the truth is?

"Dan: You know I ain't gonna talk on the phone.

"Don: Fuck you. Talk.

"Dan: No, they tape. I . . .

"Don: Was you there at the Porters?

"Dan: We ain't gonna talk, Donny.

"Don: Yes or no?

"Dan: Ain't gonna answer you."

The best Donald could do was elicit remarks showing that he and Crawford had devised a plan to try to get defendant a new trial. The tapes indicate that they had practiced their story while incarcerated together, knowing they would be moved to different jails before defendant's motion for a new trial was heard. Crawford says, "How many times did we say we better get this straight because they're gonna be separating us?" Despite their rehearsals, neither Donald nor

---

4. Although Crawford had been indicted for aggravated burglary, the state sought to amend the indictment to state the lesser offense of burglary following Crawford's testimony, citing Crawford's willingness to testify in the face of probable retaliation by prison inmates. The sentencing judge denied the request, noting that Crawford had already been shown leniency by being allowed to plead to aggravated burglary rather than murder. Crawford filed an appeal, which the state joined, challenging the authority of the sentencing judge to disregard the plea agreement. We upheld the decision of the sentencing judge, finding no abuse of discretion in imposing a sentence greater than that agreed to by the state and Crawford. However, we found that the sentencing judge abused his discretion by not allowing Crawford to withdraw his guilty plea before sentencing. See *State v. Crawford* (June 18, 1992), Cuyahoga App. No. 62851, unreported, 1992 WL 140266.

Crawford could follow their plan. Crawford stated, "Nobody knew what we had planned, you didn't even know."

This "plan" would not have been a surprise to any trier of fact given the extended period of time that Donald and Crawford spent together in the Shaker Heights City Jail. As noted by the panel presiding over the first trial, "He, Donald, had the ability and opportunity to plot with Dan Crawford * * *. For whatever reason, they, Danny and Donny, have been constantly kept together during the pendency of this matter." Of course, that plan backfired when Crawford refused to change his testimony before his sentencing hearing.

We believe that Donald's motives in taping the conversations are readily apparent from the tapes: he sought to appease those persons who might seek revenge because he had testified against the defendant. The tapes contain the following remarks:

"No, these dudes walk by, hell no, I'm telling you, no. We stopped in Lorain, got there, had to go inside of the holding area. All my dad's cats came up and were like man, what you did was right. They asked about you. What the fuck the other dude gonna do, stick with the same bullshit? I said, man, I don't know. I don't think so. This is what I said to myself. Really.

"* * *

"I heard through the grapevine that Ted's relieved that the truth was told at least by one person, me. I ain't heard nothing about you."

His remarks that his conscience no longer bothers him are understandable in view of his earlier remarks that defendant's friends were no longer upset with him.

Given this background, the spontaneity of the conversations certainly would have been at issue and, if the conversations were in fact staged, use of the tapes for impeachment purposes would have been self-defeating. Therefore, it is less than clear that a blanket permission to impeach on all matters found in the tapes would have served its intended purpose. Under these circumstances, defendant's argument that he had been denied the opportunity to impeach Crawford asks us to engage in a form of speculation that is simply not warranted on this record. At the very least, defendant has failed to show that the trial court abused its discretion by refusing to allow him to impeach Crawford by using the tape recordings.

## B

Defendant next argues that the trial court erred by refusing to allow him to recall inmate Gladding to the witness stand. Gladding had testified that he

heard defendant admit killing the Porters as revenge for newspaper accounts written about a Hell's Angels trial. Following Gladding's testimony, the defense learned that Lake County detectives investigating the murder of Michelle Hayes had taken Gladding's deposition. In that deposition, Gladding apparently related a jailhouse conversation he had had with Hayes's assailant, Steve Cohen, in which Cohen admitted killing Hayes. The defense told the court that Gladding's statement prompted Cohen to accept a plea bargain in lieu of trial.[5] Because of the alleged similarity of these "confessions" by the murderers, the defense argued that Gladding's deposition constituted exculpatory evidence and possible grounds for impeachment. It requested permission to recall Gladding for the limited purpose of cross-examining him as to the parallel circumstances of the confessions. The court denied the request, finding no nexus between the Lake County case and defendant's case.

Evid.R. 608(B) provides:

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, * * * may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness * * *."

"A witness may not be impeached by evidence that merely contradicts his testimony on a matter that is collateral and not material to any issue in the trial." *Byomin v. Alvis* (1959), 169 Ohio St. 395, 396, 8 O.O.2d 420, 421, 159 N.E.2d 897, 898. "Evid.R. 608(B) provides a well-established rule of law that protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime for which defendant was charged." *State v. Boggs* (1992), 63 Ohio St.3d 418, 422–423, 588 N.E.2d 813, 817; see, also, *State v. Leuin* (1984), 11 Ohio St.3d 172, 174, 11 OBR 486, 488–489, 464 N.E.2d 552, 554–555.

The trial judge did not abuse his discretion by refusing to allow further cross-examination of Gladding because it would have gone to a collateral matter. Gladding had already testified at trial and been thoroughly cross-examined on issues of credibility. As defense counsel noted, they only wished to cross-examine Gladding on his relationship with Cohen and the Hayes case; the questioning would not have related to issues in the Porter murders. The trial

---

5. Cohen had been convicted of aggravated murder. His conviction was overturned on appeal because the trial court improperly excluded exculpatory testimony by a codefendant. See *State v. Cohen* (Apr. 29, 1988), Lake App. No. 12–011, unreported, 1988 WL 41545, appeal dismissed (1989), 46 Ohio St.3d 602, 545 N.E.2d 646.

judge properly refused further cross-examination because it would have injected immaterial issues into the trial.

Even had the matter not been collateral, we believe that the trial court did not abuse its discretion by refusing the request to allow further cross-examination of Gladding because defendant failed to make any showing that Gladding's deposition testimony would be probative on the issue of credibility. The defense simply wanted to question Gladding on what it perceived to be the extraordinarily coincidental fact that both defendant and Cohen had told Gladding about their complicity in separate murders. In its argument to the trial judge, the defense referred to Cohen's case and stated, "the case did not go to trial. There was a deal offered to Cohen, based largely on the testimony of Martin Gladding." Obviously, Gladding's deposition testimony was sufficiently credible to the point where it forced Cohen to plead guilty to an offense. We simply fail to see how this deposition testimony would have any adverse effect on Gladding's credibility.

Accordingly, the third assignment of error is overruled.

## IV

The fourth assignment of error concerns the state's failure to provide the defense with written summaries of oral statements made by defendant, Donald Soke and inmate Glenn Davenport. The first instance concerned a conversation between an Eastlake police detective and defendant. The second instance concerned the same detective and a conversation with Donald Soke while en route to the Painesville city jail. After the second instance, defendant moved for a mistrial based on the state's failure to provide it with requested discovery matters. The third instance occurred during the penalty phase of the trial when inmate Davenport testified that defendant had told him Donald Soke and Daniel Crawford had murdered the Porters while defendant stayed in the car.

## A

Discovery of the oral statements involved in this case is governed by Crim.R. 16(B)(1)(a), which provides:

"*Statement of defendant or co-defendant.* Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:

" * * *

"(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer * * *."

In *State v. Parson* (1983), 6 Ohio St.3d 442, 6 OBR 485, 453 N.E.2d 689, the syllabus states:

"Where, in a criminal trial, the prosecution fails to comply with Crim.R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made by a co-defendant to a law enforcement officer, and the record does not demonstrate (1) that the prosecution's failure to disclose was a willful violation of Crim.R. 16, (2) that foreknowledge of the statement would have benefitted the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement, the trial court does not abuse its discretion under Crim.R. 16(E)(3) by permitting such evidence to be admitted."

The trial court is vested with a certain amount of discretion in determining the sanction to be imposed. The court is not bound to exclude such material at trial. *Id.* at 445, 6 OBR at 487–488, 453 N.E.2d at 691–692; *State v. Wiles* (1991), 59 Ohio St.3d 71, 78, 571 N.E.2d 97, 108; see, also, Crim.R. 16(E)(3). A trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery. *Lakewood v. Papadelis* (1987), 32 Ohio St.3d 1, 511 N.E.2d 1138, paragraph two of the syllabus. Our review of the court's order is limited to a determination whether it abused its discretion. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 26, 514 N.E.2d 394, 401–402.

B

Two of the occasions when the state allegedly failed to provide discovery pursuant to defendant's written request came to light during the direct examination of the Eastlake detective. The first occasion occurred in September 1987 at defendant's home in Painesville. The second occasion occurred on August 15, 1989, when Donald Soke and the same detective were en route to Eastlake in connection with the department's investigation of the LaSpina murder. During the course of their conversation, Donald Soke apparently gave the detective information relative to the Porter murders. At trial, the state asked the detective if Donald Soke made any statements implicating his father in the Porter murders. The court sustained an objection and ordered the parties to the sidebar. The court denied defendant's motion for a mistrial and the state told the court that it had no more questions for the detective.

The state had no obligation to provide written summaries of either statement since they were not made in connection with this case. Crim.R. 16(B)(1)(a) pertains solely to statements made by a *defendant or codefendant.* The Supreme Court has defined a defendant as "the accused in a criminal case." See *State v. Wickline* (1990), 50 Ohio St.3d 114, 118, 552 N.E.2d 913, 918. The Eastlake detective had been investigating the Lake County murder of Karen LaSpina. The state did not charge defendant with any offense in that case. Since Crim.R. 16 discovery procedures do not apply to unrelated criminal matters, the state had no obligation to provide written summaries of statements defendant made in an unrelated criminal investigation. *State v. Wickline, supra;* cf. *State v. Curry* (1991), 76 Ohio App.3d 175, 601 N.E.2d 176 (trial court could not order full disclosure of prosecution file where victim's confidential records were excluded from public records law and were not made in connection with the case).

Even were we to find that conversations concerning unrelated criminal matters fall within the scope of discoverable matters under Crim.R. 16, we would not find that the trial court abused its discretion in denying the motion for a mistrial. The record does not indicate that the state willfully withheld discoverable oral statements by defendant and Donald Soke. Indeed, the state could reasonably have assumed that it was under no obligation to produce statements made during the investigation of an unrelated crime. Moreover, although the court overruled objections to the detective's testimony, the state did not pursue that testimony with either witness. Since the state did not inject into the record any more evidence relating to investigations by the Lake County authorities, defendant can show no demonstrable prejudice.

## C

■ Defendant next argues that the state withheld exculpatory evidence demonstrating that defendant had not participated in the Porter murders. During the penalty phase of the trial, defendant called inmate Glenn Davenport, who testified that he gave a statement to Shaker Heights police in September 1990. The statement detailed a conversation between defendant and Davenport in which defendant allegedly told Davenport that Donald Soke had killed Dorothy Porter and Daniel Crawford had killed Phillip Porter. According to Davenport's statement, defendant told Davenport that he had picked out the Porter house, but remained in the car while the burglary and murders occurred.

Defendant argues that Davenport's version is similar to Crawford's in that one of them remained behind while the murders took place. He reasons that the state believed Crawford's version since it did not charge him with complicity; therefore, defendant maintains that had he been provided Davenport's statement prior to trial, he could have reworked his defense and, as his theory goes,

received the favorable treatment that Crawford received and not been put on trial for aggravated murder.

As an initial matter, we note that defendant did not object to the use of the statement until after he had finished his redirect examination of Davenport and had extensively questioned him on the statement. Had a timely objection been interposed, the court could have continued the proceedings to consider whether the statement contained exculpatory matter and, if so, whether the state had wrongfully withheld that information. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364; *State v. Perry* (1992), 80 Ohio App.3d 78, 86, 608 N.E.2d 846, 851.

It also appears that the defense apparently did know the contents of Davenport's statement. Defendant called Davenport to testify at the guilt phase of the trial. Prior to Davenport's testimony, the defense sought some leniency in its direct examination of inmate witnesses due to its belief that the inmates would be hostile or adverse. In support of the request for leniency, counsel stated:

"There have been three opportunities to testify, last July, last October and just most recently the early part of April of 1992. They [inmates Davenport and Lee Eastridge] were not called, *and we know that they made statements.* * * * They know something, and we have a need here, and the need comes in under statute of anything else." (Emphasis added.)

During his examination of Davenport, defense counsel asked Davenport, "[w]ould you ever think of going out on the track or to the bleachers or the sand box or wherever and say, I killed this guy?" This question dovetailed with specific parts of Davenport's statement, which defense counsel contended it had not seen:

"About June of 1988, while in the recreation yard at Marion, I approached the bleachers with two other men, and got involved in a conversation concerning the death of LaSpina in Eastlake, Ohio. Supposedly, these same people were involved in the death of some newspaper people in Shaker Heights, Ohio. " * * *

"It was either in June or July 1990, I was pitching horseshoes * * * with a young kid by the name of Ted Palladino. I looked up to see Ted Soke dragging a bench over by the horseshoe pits where he set down and tried to start up a friendly conversation. * * * I left, made a lap around the yard. * * *"

Counsel's question referring to bleachers, a track and a sandbox seems too connected to specific facts in Davenport's statement to be coincidental. In this vein, the state noted that it made all statements available to the defense prior to trial, and the defense agreed that it had looked at various statements. Given defense counsel's acknowledgment that Davenport had made statements, the

obvious factual basis for his questions to Davenport, and the defense's acknowledgment that it had inspected various statements, we believe that defendant had sufficient access to Davenport's statement prior to trial.

Finally, even were we to find that the state had willfully withheld exculpatory matter from the defense, we conclude that defendant suffered no prejudice as a result of the withholding. In *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481, the Supreme Court of the United States held that if there was error in failing to disclose material evidence, there must also be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *Kyles v. Whitley* (1995), 514 U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490; *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus. The court went on to say that the violation of the duty to disclose is not grounds for reversal, unless the defendant is denied a fair trial. *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3379–3380, 87 L.Ed.2d at 489–490; *State v. Perry,* 80 Ohio App.3d at 85, 608 N.E.2d at 850–851.

Defendant fails to show a reasonable probability that had he been provided with Davenport's statement, the results during the guilt phase of the trial would have been different. Defendant did not put on a defense, and he makes no claim that he would have done so had he been in possession of Davenport's statement. It is noteworthy that defendant called Davenport as a witness during the penalty phase and sought permission to treat him as a hostile witness even though he apparently knew the contents of the statement. It seems unlikely that the defense would have treated Davenport's testimony any differently had he been called as a defense witness during the guilt phase of the trial.

In any event, we find no reasonable probability that the result of the proceedings would have been different had defendant been provided with Davenport's statement prior to the guilt phase of the trial. The best defendant can argue is that he might have struck a deal similar to the one Crawford made with the state. Amorphous conclusions as to the state's motives are insufficient to show prejudice sufficient to conclude that the state denied defendant a fair trial by withholding Davenport's statement. Accordingly, we overrule the fourth assignment of error.

## V

The fifth assignment of error is that the trial court erred by allowing prejudicial "other acts" evidence to be introduced to the jury. Defendant argues

that the state insinuated that he had threatened a witness, had a poor relationship with his son, never worked and was involved in other murders.

Evid.R. 404(B) governs the admissibility of evidence of other acts:

"Other crimes, wrongs or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

"Evidence of other acts is admissible if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, plan, knowledge, identity, or absence of mistake." *State v. Lowe* (1994), 69 Ohio St.3d 527, 530, 634 N.E.2d 616, 619, citing *State v. Broom* (1988), 40 Ohio St.3d 277, 282–283, 533 N.E.2d 682, 689–691. "Evidence of other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity." *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75, 78. As with all evidence, other acts evidence is subject to the relevancy and fairness requirements of Evid.R. 403, reviewable by this court for an abuse of discretion.

We find that the evidence complained of is not "other acts" as defined by Evid.R. 404(B). Defendant cites as other acts evidence Daniel Crawford's statement that he did not testify at defendant's previous trial because he was afraid of defendant's "biker friends," Dean Soke's (another of defendant's sons) statement that he had a poor relationship with defendant, and testimony that defendant's grandmother was the only person in the family who worked.

The state did not offer evidence of defendant's family life in order to prove defendant's character and show that he acted in conformity therewith. The evidence did tend to explain why family members and other witnesses testified at trial, or refused to testify at defendant's previous trial. Strained family relations in this context are not "bad acts" as contemplated by Evid.R. 404(B). *State v. Webb* (1994), 70 Ohio St.3d 325, 340, 638 N.E.2d 1023, 1036.

Crawford's testimony of intimidation by defendant's biker friends also does not fall within those acts proscribed by Evid.R. 404(B). The threats of intimidation did not come from defendant; they came from his friends. Consequently, they are not other acts of the defendant. Moreover, defendant's association with bikers is not evidence of other bad acts. Reference to the unsavory reputation of a defendant's associates, without some testimony linking the defendant to the purported intimidation, is not reversible error.

Finally, we note that evidence of threats or intimidation of witnesses reflects a consciousness of guilt and is admissible as admission by conduct. *State v. Richey* (1992), 64 Ohio St.3d 353, 357, 595 N.E.2d 915, 920–921. Hence, intimidation of a witness is not "wholly independent" of the charged offenses. See *State v. Leonard* (May 21, 1993), Lawrence App. No. CA92–12, unreported, 1993 WL 172198; *State v. Reese* (Jan. 7, 1988), Cuyahoga App. Nos. 53115 and 53116, unreported, at 22–23, 1988 WL 1556.

Defendant also complains that the court erred by allowing the state's witnesses to mention defendant's suspected involvement in the Lake County murder of Karen LaSpina. The state did not charge defendant in that case, although his son Donald entered a guilty plea and received a sentence of life without parole.

Witnesses necessarily mentioned defendant's suspected involvement in the LaSpina murder in order to give context to the police investigation of the Porter murders. An Eastlake police detective investigating the LaSpina murder testified that he received information leading him to Donald Soke. Subsequent prison contacts confirmed Donald Soke's involvement and led police to believe that Soke had been involved in the Porter murders. Prison inmates told police of statements made by defendant, Donald Soke and Crawford. This information led to defendant's arrest for the Porter murders.

We note that the court sustained several objections to questions which may have elicited answers tending to tie defendant to the LaSpina murder investigation. Given the complex nature of the investigation in this case, it is perhaps inevitable that there would be some overlap between the LaSpina and Porter murder investigations. They were, in a sense, interwoven in fact and circumstance. See *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124, 132. However, the trial court minimized any prejudice which might have accrued to defendant. We cannot say that isolated references to the LaSpina murder investigation deprived defendant of a fair trial. The fifth assignment of error is overruled.

## VI

The sixth assignment of error is that the trial court erred by allowing unfairly prejudicial testimony by inmate Martin Gladding. Gladding testified that he was threatened before coming into court to testify.

Gladding stated his motivation for testifying as follows:

"Because I decided to change my life, wanted to get on and do things right. And that's the only thing I can think of starting right here getting [*sic* ] today. I

want to change my life. You know, I'm tired of being threatened by people and stuff, you know, about things I know."

Gladding further testified that he had been threatened in prison right before coming to testify at trial.

Under Evid.R. 401, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403(A).

Gladding's testimony of threats was relevant to counter defendant's assertions that he lacked credibility. All evidence of defendant's guilt came from prison inmates. The defense continually attacked their testimony as self-serving and motivated by an interest in obtaining plea bargains or special considerations. The specter of intimidation, considered along with the state's assertion that it had made no promises of special treatment, tended to bolster Gladding's testimony. The sixth assignment of error is overruled.

## VII

The seventh assignment of error is that the court improperly admitted gruesome photographs into evidence during both the guilt determination and penalty phases of the trial. The challenged photographs were taken during the autopsies of Dorothy and Phillip Porter.

In *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, the court set forth the standard for reviewing the admissibility of photographs in a capital case:

"Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *Id.* at paragraph seven of the syllabus.

Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Jackson* (1991), 57 Ohio St.3d 29, 37, 565 N.E.2d 549, 558–559.

The trial court did not abuse its discretion by admitting the Porter autopsy photographs. Defendant particularly objects to the admission of state exhibit 3, a photograph of Dorothy Porter showing a close-up view of her face. The deputy coroner described the photograph as follows:

"State's Exhibit 3 is a portrait of Mrs. Porter as she was observed laying [sic] on the autopsy table. And in this photograph one could see many of the juries [sic] that I have already described that were present on her face. There is clearly visible swelling and discoloration of the lids of the right eye, particularly the upper lid. There is scraping and some tearing of the skin in the region of the left eyebrow, and there is scraping visible [on] the left cheek and some scraping and bruising of the nose. One could see that there is some injury to the right lower lip, and there is a scrape on the left side of the lower cheek, opposite the angle of the mouth and some discoloration of the chin."

The bluish discoloration of Dorothy Porter's face was relevant to show the length of time she had lain on the basement floor. At trial, defendant attempted to challenge the time frame in which the murders occurred, implying that the Porters had not been killed until some time after May 17, 1985. Although he could not pinpoint the time of death with certainty, the coroner was able to approximate the time of death, in part, by how the victims' blood had settled in their bodies. Hence, the photographs, and in particular state's exhibit 3, were relevant to show the time of death.

Additionally, the trial court properly admitted state's exhibit 3 into evidence since it gave a basis from which the jury could infer that the scraping and bruising on Dorothy Porter's body were injuries consistent either with being dragged down a flight of stairs or struggling with an assailant. These facts tended to corroborate Crawford's testimony about hearing a woman's screams coming from the upstairs part of the house. This substantiated the state's theory that defendant or Donald Soke had dragged the struggling Dorothy Porter down a flight of stairs into the basement before killing her.

Finally, we have examined the photographs and find that they were not so gruesome that their prejudicial impact substantially outweighed their probative value under Evid.R. 403(A). We believe that the unsettling nature of the photographs is more than likely due to the advanced age of the victims, not the injuries portrayed in the photographs. The seventh assignment of error is overruled.

## VIII

The eighth assignment of error is that the court erred by allowing victim-impact evidence during the guilt phase of the trial. Defendant complains that the court erred when it admitted into evidence state exhibit 21, a photograph of the Porters on their twenty-fifth anniversary, taken in April 1985. Jolie Arnos, Dorothy Porter's daughter, testified and identified several photographs of the Porter residence, along with the photograph of the Porters on their anniversary.

Defendant argues that this photograph amounted to impermissible victim-impact evidence.

The photograph did not constitute a victim-impact statement.[6]  In *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212, the court considered an argument that the trial court had allowed the state to introduce victim-impact evidence both in the guilt and penalty phases of the trial.  The evidence in question concerned, among other things, the victims' advanced age, the length of their marriage, and their physical weaknesses.  *Id.* at 420, 613 N.E.2d at 218. The court held:

"For the most part, this evidence illustrated the nature and circumstances of the crimes, since the physical condition and circumstances of the victims are relevant to the crime as a whole.  The victims cannot be separated from the crime.  * * * Moreover, this court in *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077, cited *Payne* for the proposition that 'the mention of the victims' personal situations and their relatives did not violate the Constitution.'"  *Id.* at 420–421, 613 N.E.2d at 218–219.

These concerns apply with equal force in this case.  The state made a single, brief reference to the photograph during Jolie Arnos's testimony.  We find no prejudice from that isolated reference.  The eighth assignment of error is overruled.

## IX

The ninth assignment of error is that the jury's verdict is against the manifest weight of the evidence.  In particular, defendant challenges the credibility of Daniel Crawford and the inmate witnesses based on promises for lighter sentences and protection offered by the state in exchange for their testimony.

The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact.  *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.  This court will not reverse a verdict where there is substantial evidence upon which a trier of fact could reasonably conclude that all the elements of the offense have

---

6. We must reject the state's argument that state exhibit 21 was admissible under authority of *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720.  In *Payne,* the court concluded:

"We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the *sentencing phase* evidence of the specific harm of the defendant."  (Emphasis added.) 501 U.S. at 825, 111 S.Ct. at 2608, 115 L.Ed.2d at 735.

Defendant's assignment of error concerns the guilt phase of the trial, not the sentencing phase.  Accordingly, *Payne v. Tennessee* does not apply.

been proven beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132.

The state's witnesses readily testified to matters tending to lessen their credibility. Daniel Crawford admitted that he had lied on several occasions to the police, the grand jury and the courts. He admitted smoking marijuana and drinking on the day the Porters were murdered. Crawford acknowledged that the state gave him preferential treatment by asking the grand jury to return an indictment only for burglary in this case. The state also offered to recommend the lightest sentence possible in exchange for his testimony against defendant. When the trial court ignored the state's request for the minimum sentence, Crawford conceded that the state joined in efforts to withdraw his guilty plea.

The prison inmates who testified at trial acknowledged that they received assurances of protection. Some of them admitted they testified against defendant in the hopes of parlaying that testimony into favorable treatment from the state.

In this case, the outcome hinged almost entirely on the credibility of the witnesses. The trier of fact is entitled to believe or disbelieve the testimony of the state's witnesses and/or the defense witnesses. *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548. Certainly, the jury was in the best position to assess the credibility of the witnesses, particularly in view of the state's promises to those witnesses and the vigorous cross-examination conducted by the defense. It obviously considered the demeanor of the witnesses and the manner in which they testified, their connection or relationship with defendant, and their interest, if any, in the outcome. *Id.* at 67, 26 O.O.2d at 369, 197 N.E.2d at 553. Despite defendant's attempts to challenge the credibility of the state's witnesses, the jury found those witnesses credible. We will not disturb the jury's findings. The ninth assignment of error is overruled.

## X

The tenth assignment of error is that the trial court erred by failing to instruct the jury that it must find beyond a reasonable doubt relative to a specific subgrouping pursuant to R.C. 2929.04(A)(7). Defendant maintains the trial court failed to instruct the jury to determine whether he acted as the principal offender or acted with prior calculation or design. Defendant argues that in the absence of such an instruction, the jury may well have split on whether he acted as the principal offender or with prior calculation or design, thus making him ineligible for the death penalty.

R.C. 2929.04, as relevant to this appeal, provides the criteria for imposing a sentence of death or imprisonment for a capital offense:

"(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

" * * *

"(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

Defendant did not object to the jury instructions given during the penalty phase of the trial; therefore, absent plain error, he has waived the right to assert error in the instructions. Crim.R. 52(B); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804; *State v. Broom* (1989), 40 Ohio St.3d 277, 281, 533 N.E.2d 682, 689. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long*, at paragraph three of the syllabus; *State v. Campbell* (1994), 69 Ohio St.3d 38, 42, 630 N.E.2d 339, 346. In this respect, "capital defendants are not entitled to special treatment regarding evidential or procedural rules * * *." *State v. Greer* (1988), 39 Ohio St.3d 236, 244, 530 N.E.2d 382, 394.

In *State v. Sneed* (1992), 63 Ohio St.3d 3, 584 N.E.2d 1160, the court addressed an identical argument that the disjunctive nature of the verdict form had the potential of creating a unanimous jury verdict with fewer than all the jurors actually finding Sneed to be the principal offender:

"We are not persuaded by appellant's argument. We observe that the jury found, on a separate verdict form, that the appellant 'DID personally perform every act constituting the offense in this case of Aggravated Murder.' Prior to the jurors' signing this verdict form, the trial judge defined the term 'principal offender' in the jury instructions as 'one who personally performs every act constituting the offense, in this case aggravated murder.' Therefore, upon signing this separate verdict form each juror found that the state had met its burden of proving beyond a reasonable doubt that appellant was the principal offender on the aggravated murder. This renders any claimed ambiguity in the complained-of verdict form resolved." *State v. Sneed,* 63 Ohio St.3d at 11, 584 N.E.2d at 1168.

The court further emphasized that the evidence in *Sneed* did not reasonably suggest that an individual juror could have found Sneed was not the principal

offender. *Id.* at 12, 584 N.E.2d at 1169. The court noted that Sneed "neither introduced any tangible evidence that he was the accomplice rather than the principal offender, nor did he testify to that effect." *Id.*

Contrary to defendant's assertions, "the evidence in this case does not reasonably suggest that an individual juror could have found [him] not to be the principal offender." *Id.* Defendant did not testify or present any evidence to substantiate his claim that he remained in the automobile while Donald Soke and Daniel Crawford murdered the Porters. The only testimony tending to bolster this claim came from prison inmate Glen Davenport in a statement to the Shaker Heights police. Davenport told the police that defendant said that he remained in the car outside the Porter home while the murders occurred. This testimony did not occur until the penalty phase of the trial, well after the point at which the jury could consider defendant's claim for purposes of guilt or innocence.

Even had defendant offered Davenport's testimony during the guilt phase of the trial, we believe that the jury would have found it wholly self-serving when viewed against testimony by the state's witnesses. Davenport's statement was not based upon firsthand knowledge, but upon statements defendant allegedly made to other inmates while in prison. Seen in this context, defendant's statements directly contradicted statements he made to other prison inmates. Accordingly, we conclude the evidence in this case does not reasonably suggest that defendant was other than the principal offender. Because the alleged error does not rise to the level of plain error, the tenth assignment of error is overruled.

## XI

The eleventh assignment of error complains that the death sentence in the second trial violates defendant's right not to be placed in jeopardy twice on the sentence of death.[7] Prior to the second trial, defendant argued that the state could not seek the death penalty since the subsequently vacated life sentence imposed following his first trial precludes the imposition of the death penalty at his retrial. The trial court rejected this argument.

In *Bullington v. Missouri* (1981), 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270, the court held that the state of Missouri could not seek the death penalty at a retrial of a defendant's conviction for capital murder when the jury at the first trial refused to impose the death penalty. The court found that Missouri's bifurcated capital sentencing procedure resembles a trial on the issue of guilt or

---

7. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides, " * * * nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb * * *."

innocence because it explicitly requires the jury to designate in writing the aggravating circumstance or circumstances that it finds beyond a reasonable doubt. The Missouri statutes further require the jury to be convinced beyond a reasonable doubt that any aggravating circumstance or circumstances that it finds to exist are sufficient to warrant the death penalty. The court found that a sentence of life imprisonment received over the state's request for the death penalty meant that "the jury has already acquitted the defendant of whatever was necessary to impose the death sentence." *Id.*, 451 U.S. at 445, 101 S.Ct. at 1861, 68 L.Ed.2d at 283.

The court explained this principle in *Caspari v. Bohlen* (1994), 510 U.S. ——, 114 S.Ct. 948, 127 L.Ed.2d 236, and referred to *Bullington* when stating:

"We nonetheless held that because Missouri's 'presentence hearing resembled and, indeed, in all relevant respects was like the immediately proceeding trial on the issue of guilt or innocence,' *ibid.*, the first jury's refusal to impose the death penalty operated as an acquittal of that punishment." *Id.*, 510 U.S. at ——, 114 S.Ct. at 954, 127 L.Ed.2d at 247.

The court has applied *Bullington* to find that the Double Jeopardy Clause prohibited the state of Arizona from sentencing a defendant to death after the life sentence he had received on his conviction for felony murder was set aside on appeal, notwithstanding that the sentence was imposed by a judge. See *Arizona v. Rumsey* (1984), 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164.

The state of Ohio's capital sentencing scheme requires the jury or the three-judge panel to find, beyond a reasonable doubt, that the aggravating circumstances outweigh the factors in mitigation of the sentence of death. R.C. 2929.03(D)(1) provides:

" * * * The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, *beyond a reasonable doubt*, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death." (Emphasis added.)

Under *Arizona v. Rumsey, supra*, R.C. 2929.03(D)(2) would apply with equal force to determinations made by a three-judge panel. See *State v. Dickerson* (1989), 45 Ohio St.3d 206, 208–209, 543 N.E.2d 1250, 1253–1254. In this case, the three-judge panel presiding over defendant's first trial imposed a life sentence. The panel did not issue a separate opinion setting forth the reasons why it could not find that the aggravating circumstances were sufficient to outweigh the

mitigating factors pursuant to R.C. 2929.03(F).[8]  We must therefore assume the panel found that the state failed to meet its burden of proving the existence of aggravating circumstances because the statutes allow no other conclusion.  R.C. 2929.03(D)(3) provides:

" * * * if the panel of three judges unanimously finds, that the aggravating circumstances the offender was found guilty of committing outweigh mitigating factors, *it shall impose sentence of death* on the offender * * *."

Since the panel necessarily concluded the state had failed to establish the existence of aggravating circumstances by proof beyond a reasonable doubt, the principles of double jeopardy set forth in *Bullington v. Missouri, supra*, apply.

In support of its contention that the Double Jeopardy Clause does not bar the state from seeking the death penalty in defendant's second trial, the state cites *State v. Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925.  In *Davis*, the syllabus states:

"When a reviewing court vacates the death sentence of a defendant imposed by a three-judge panel due to an error occurring at the penalty phase, not otherwise covered by R.C. 2929.06, and the reviewing court does not find the evidence to be legally insufficient to justify imposition of the death sentence, such reviewing court may remand the action to that trial court for a resentencing hearing at which the state may seek whatever punishment is lawful, including, but not limited to, the death sentence."

In *Davis*, a three-judge panel presiding at trial imposed the death penalty.  On appeal, the Supreme Court reversed in part and remanded for resentencing, finding that the trial court improperly weighed the aggravating circumstances it found Davis guilty of committing against the mitigating factors it also found to be present.  *Id.* at 372, 528 N.E.2d at 935–936.  The court went on to consider the penalties which may be imposed upon resentencing.  Concluding that it had not found the evidence in the case to be legally insufficient to justify imposition of the

---

8.  R.C. 2929.03(F) provides:  in relevant part:

"The court or panel, when it imposes life imprisonment under division (D) of this section, shall state in a separate opinion its specific findings of which of the mitigating factors set forth in division (B) of Section 2929.04 of the Revised Code it found to exist, what other mitigating factors it found to exist, what aggravating circumstances the offender was found guilty of committing, and why it could not find that these aggravating circumstances were sufficient to outweigh the mitigating factors * * *.  The judgment in a case in which a sentencing hearing is held pursuant to this section is not final until the opinion is filed."

The record on appeal does not contain a separate opinion setting forth the panel's findings regarding the existence of mitigating factors and aggravating circumstances, and why the panel could not find that the aggravating circumstances outweighed the mitigating factors. Ordinarily, the judgment of conviction would not be final until the panel filed the opinion. However, since the court granted a new trial, the absence of an opinion under R.C. 2929.03(F) does not bar our review.

death penalty, the court concluded that the state could seek the death penalty on remand. *Id.* at 373, 528 N.E.2d at 936. In determining the state was not barred from seeking the death penalty on resentencing, the court distinguished *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744.

In *Penix,* the court held that R.C. 2929.03(D)(3) required the same jury hearing the original penalty phase evidence had to rehear that same evidence on appeal. *Id.* at 372, 513 N.E.2d at 747. Since Davis had been tried before a three-judge panel, the court believed that it was not compelled to follow *Penix,* which "placed great significance on the role of the jury in the sentencing process in death penalty cases." *Id.* at 373, 513 N.E.2d at 936, fn. 13.

The state maintains that this case is analogous to *Davis* in the following respects: (1) each case was tried to a three-judge panel; (2) each defendant was found guilty and presented evidence at mitigation; and (3) in each case the original three-judge panel committed error in the penalty phase.

This appeal is readily distinguished from *Davis* due to the fact that the three-judge panel in this case imposed a *life sentence,* not the death penalty. The court remanded the case for resentencing because the errors occurring during the penalty phase of the trial were unrelated to the legal sufficiency of the evidence supporting the death penalty. Although the panel set aside defendant's first conviction on procedural grounds, the life sentence it imposed necessarily meant that the state failed to carry its burden of proving beyond a reasonable doubt that the aggravating circumstances outweighed the factors in mitigation. As a consequence, *Davis* provides no authority for the state's position.

Since the three-judge panel hearing defendant's first trial necessarily found that the state had failed to show by proof beyond a reasonable doubt the existence of aggravating circumstances which outweighed the mitigating factors, we must follow *Bullington v. Missouri* and find that double jeopardy attached. Defendant could not be sentenced to death at his second trial. Accordingly, we sustain the eleventh assignment of error and vacate the death sentence. We remand with instructions to resentence in accordance with *State v. Penix.*[9]

## XII

In his fifteenth assignment of error, defendant maintains that trial counsel's representation constituted a denial of his right to effective assistance of counsel. In support of this contention, defendant cites various instances where counsel's representation was deficient. Many of these instances relate to the penalty

9. Our disposition of the eleventh assignment of error necessarily moots consideration of defendant's twelfth, thirteenth, fourteenth and sixteenth assignments of error, all of which relate to errors occurring during the penalty phase of the trial.

phase of the trial. Given our disposition of the eleventh assignment of error, we now find these arguments moot. We will address only those arguments dealing with the guilt phase of the trial. Defendant's remaining bases for finding ineffective assistance of counsel are (a) counsel's failure to request a mistrial following numerous prospective jurors' statements concerning their exposure to media reports of defendant's first trial, and (b) counsel's failure to use a preemptory challenge to remove a juror who stated that she could not be impartial after having been exposed to those media reports.

In order to establish a claim of ineffective assistance of counsel, the burden is on the defendant to show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Johnson* (1986), 24 Ohio St.3d 87, 89, 24 OBR 282, 283–284, 494 N.E.2d 1061, 1063. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's error, the result of the trial would have been different. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

As we stated in our discussion of the first assignment of error, defense counsel did raise the issue of juror exposure to media reports concerning the first trial in defendant's motion for an individually sequestered venire. In response to that motion, the court heard argument and made the following ruling:

"Let me suggest this: I am going to let counsels [*sic* ] individually inquire as to that issue. I know I'm not going to limit your inquiry, because I do think it's a critical issue."

We find counsel made an appropriate objection in accordance with his essential duties to defendant. While the court did not grant an individually sequestered venire, it did grant defendant the opportunity to inquire as to possible exposure to media reports. Under the circumstances, a motion for a mistrial would have been needless. Counsel did not fail to provide an essential duty to defendant.

In our discussion of the second assignment of error, we addressed defendant's claims concerning the court's failure to dismiss the juror who said that she could not remain impartial. The court clearly misspoke, as the record shows that the juror in question did not sign the verdict form. Accordingly, the fifteenth assignment of error is overruled.

The judgment is affirmed in part and reversed in part and the cause is remanded for resentencing.

*Judgment accordingly.*

James D. Sweeney and Nugent, JJ., concur.