OPINION
Defendant-appellant Tanisha Jenkins appeals from her conviction after a jury trial for aggravated murder with two firearm specifications.
Appellant asserts her rights to due process of law and a fair trial were compromised by the actions of the prosecutors in failing to provide her with adequate discovery, introducing improper evidence, and making an improper comment during closing argument. Appellant also challenges both the sufficiency and the weight of the evidence upon which her conviction was based.
This court has reviewed the record, finds appellant's constitutional rights were not violated by the prosecutors' conduct, and further finds appellant's conviction is fully supported; therefore, her conviction is affirmed.
Appellant and the victim, Phyllis Monique Sumpter, had been friends since their childhood. In their later teen years, however, their lives had taken different paths. Sumpter entered into a long-term relationship with Lamont Latimer, eventually became the mother of Latimer's two sons, and then began taking classes in order to obtain her high school equivalency degree. Appellant sought and gained employment as a dancer at a "strip bar"[1] she and her mother also became involved with drug dealers.
During the winter of 1997-1998, appellant moved into the home of her mother and step-father, the upstairs unit of a two-family house located at 3559 East 140th Street in Cleveland, Ohio. Appellant also re-established her connection to the victim by telephoning her and conversing with her.
In April 1998, through her employment at the bar, appellant met a heroin dealer named Michael White. Shortly thereafter, appellant discovered her mother was one of White's customers. Appellant and White began to see each other socially.
Appellant eventually inquired of White during a conversation at her home if he had a gun. When he responded in the negative, she asked if he knew of anyone who would either sell one or "trade a shotgun for a small gun." Appellant then showed White a shotgun sitting behind some bags on the floor" of the dining room. White said, "No, I don't know anybody," then asked appellant, "What for?" Appellant told him "she wanted to kill somebody."
Although White initially thought appellant was joking, her subsequent insistence during their conversations that she wanted to kill someone convinced him otherwise. Moreover, appellant elaborated on her statement by telling him "she wanted something small so she could walk to up the girl, shoot her, and get away." Appellant initially explained that she had "gotten into it" with a fellow employee, then later accounted for her statement by indicating she and another girl had an altercation "over a guy."
In late April 1998, appellant ceased working; she indicated to her mother that she intended to pursue a high school equivalency degree. Appellant continued her contact with the victim. On the night of May 10, 1998, appellant telephoned the victim while the victim was celebrating Mother's Day with her family. The conversation eventually became heated. Upon its termination, the victim seemed disturbed and informed her sister she would not accept another call from appellant.
The following morning, however, appellant telephoned the victim's home several times in an effort to speak to her. The victim had planned to drive downtown that afternoon to retrieve some documents. Eventually, the victim spoke to appellant; at approximately 12:30 p.m., appellant telephoned the victim's house to inquire if the victim had "left yet." Appellant sounded "anxious." Earlier, appellant had told her family she had obtained "a ride" but did not indicate her destination.
At approximately 1:15 p.m., Willie Mae Quinn, who lived in the downstairs unit at 3559 East 140th Street, was folding laundry in her dining room when she heard a "shotgun go off, boom." Quinn had heard the same sound two weeks previously; shots were fired that sounded as if the shooter had been standing on the upstairs back porch and firing into the yard.
Quinn ran to her window, from which she could see the driveway. A car was parked there, and appellant was "standing at the [passenger] side of the car" with a shotgun in her hands. Quinn observed no apparent expression on appellant's face, then a movement inside the car caught Quinn's attention: the driver, later identified as Phyllis Monique Sumpter, "slumped against the [driver's side] window."
Quinn realized she had just heard the occurrence of a probable homicide; therefore, she immediately telephoned "911." Quinn's call came just two minutes after the police received an emergency call from appellant's mother, who stated she had heard a gunshot but did not know if anyone needed medical assistance.
The sound of the shot also drew the attention of Charlean Fields, appellant's next-door neighbor. Fields had been watching television but went to her side door to investigate the sound. She saw appellant "standing in front of the car [parked in the driveway] with a gun." The car's doors were closed.
Appellant stood motionless for a few moments, then ran up the outside stairway of her house. Appellant's mother had emerged from the doorway, meeting appellant "halfway on the steps." Appellant's mother "took the gun" as the two of them went into their home. Appellant's mother then re-emerged to stand on the back porch of the house, apparently looking at the car in the driveway, and shouted, "Oh, my God. What have you done[?]"
Quinn called to appellant's mother to ask if she had "called 911." Appellant's mother "said she did"; therefore, Quinn retreated into her house to await the arrival of the police.
Several Cleveland police officers responded to the scene within minutes. Upon their arrival, appellant approached them and pointed to the car in the driveway. Officer Christopher Delk went immediately to the victim to ascertain her condition. As Delk was checking for a pulse, Officer Curtis Miller, in an attempt merely to gain information concerning the situation, asked appellant, "Who shot your friend?" Appellant calmly responded, "I did." At that point, appellant was placed under arrest.
The autopsy subsequently performed on the victim demonstrated the victim died as the result of a shotgun wound to the right side below the breast. Forensic analysis of the victim's clothing indicated the gun was fired from a distance of five to six feet.
After being informed of her rights, while still at the scene, appellant volunteered information as to the location of the shotgun in the basement of the house. She further told the officers they could find the shotgun shells in the pocket of her jacket in the dining room. Thus, the officers recovered one spent shell, six live shells, a knife, and a glove from appellant's jacket pocket.
Moreover, appellant told Gregory King, the detective immediately assigned to the investigation, that the victim had come for a "visit." Appellant stated the victim asked to see the shotgun appellant had brought downstairs to show her and that appellant thereupon "wanted to make sure that the gun was unloaded and, as she did so, the gun fired and struck the victim."
The following day, May 12, 1998, appellant gave the following oral description of the incident to the police detectives: (1) appellant called the victim and requested a ride to "pick up some papers"; (2) appellant "wanted to show the victim her shotgun"; (3) before taking the shotgun downstairs, appellant "loaded it with two rounds and wrapped it in a pair of blue jeans"; (4) appellant opened the passenger door of the victim's car, sat on the seat, and displayed the shotgun; (5) the victim told appellant she "wanted to see the gun"; (6) appellant "said she would unload it"; and (7) as appellant was attempted to do so "by pulling back the slide, [the shotgun] went off," striking the victim. Appellant stated she then left the car to seek out her mother.
On May 14, 1998 King obtained appellant's mother's consent to search the apartment. He found a pair of blue jeans with a defect in one of the pant legs. Forensic analysis of both the defect and fibers found in the victim's car indicated the shotgun had been fired at the victim through the jeans.
Appellant subsequently was indicted on one count of aggravated murder, R.C. 2903.01(A). The indictment contained two firearm specifications, which alleged appellant both possessed a firearm and used it to facilitate the crime. Appellant entered a plea of not guilty to the indictment.
The record reflects several pretrials were conducted. Appellant's counsel also made a formal demand for discovery. The state's formal response indicated appellant had made oral statements. According to the prosecutors' summary, appellant's May 11, 1998 oral statement was made "to Det. King" and "in the presence of Det. Larry #796 and Ptl. Miller #960"; appellant's May 12, 1998 oral statement was made "to Det. Cipo," who was at that time "in [the] company of Det. Hasan #2358." The prosecutors also attached a list of the witnesses they intended to call at trial. Although Michael White's name was included, neither an address nor a telephone number for White was set forth.
Appellant's case was called for trial on September 10, 1998. The two prosecutors representing the state presented the testimony of seventeen witnesses, including Latimer, the victim's sister, Quinn, Fields, the forensic examiners, appellant's mother, the assistant county coroner who had performed the victim's autopsy, Delk, Miller, White, King and Det. Hasan. Numerous physical exhibits also were introduced into evidence.
Following the trial court's denial of her motion for acquittal, appellant presented the testimony of her step-father. Appellant's step-father indicated the victim and appellant had talked for some length of time before appellant returned to the apartment for something and also stated the victim "waved" to him as he left for work.
The jury ultimately found appellant guilty of aggravated murder with firearm specifications. The trial court thereupon sentenced appellant to a term of incarceration of life with parole eligibility after twenty years, to be served consecutively with a three-year term on the firearm specifications.
Appellant has filed a timely appeal of her conviction. She presents seven assignments of error for review. Since appellant's first, second, third and fourth assignments of error present similar issues, they are addressed together as follows:
 I. MISCONDUCT ON BEHALF OF THE PROSECUTING ATTORNEY IN CLOSING ARGUMENT DEPRIVED THE APPELLANT OF A FAIR TRIAL AS REQUIRED BY THE CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF OHIO.
 II. THE STATE'S FAILURE TO PROVIDE THE APPELLANT WITH DISCOVERY VIOLATED HER RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL AS GUARANTEED BY THE CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF OHIO.
 III. THE APPELLANT WAS DENIED HER CONSTITUTIONAL RIGHT TO A FAIR TRIAL BASED UPON THE STATE'S IMPROPER INTRODUCTION OF EVIDENCE RELATING TO HER BAD CHARACTER.
 IV. ADDITIONAL INSTANCES OF MISCONDUCT DEPRIVED THE APPELLANT OF HER CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
Appellant argues her rights to a fair trial and to due process of law were compromised by several instances of improper conduct on the part of the prosecutors. This court has examined the record in light of appellant's arguments and does not find her arguments persuasive.
Appellant's first challenge is to a remark made by one of the prosecutors during closing argument. Appellant contends the following statement by the prosecutor violated her constitutional privilege against self-incrimination:
[PROSECUTOR JOHNSON]: * * *
What did [the victim] get for her trouble?
 For the love that she showed Tanisha Jenkins, for the faith that she displayed in Tanisha Jenkins, for the willingness to help Tanisha Jenkins, what did she get?
 She got a gunshot in her heart. She got wadding lodged in the left side of her heart. That's the thanks she got for the help she was willing to provide.
 Now, it's natural at this point to want to know why. We may never know why. The State isn't obligated to prove why.
 On May 11th, 1998, at about 1:30, before this gun went off, there were two people who could answer the question why. One of them is not here anymore (sic)
Following appellant's objection and the trial court's decision on the matter, the prosecutor resumed her argument thusly:
 The State is not obligated to prove motive, but what we can do, and have done beyond a reasonable doubt, is prove the facts of how and what happened on May 11th of 1998.
The conduct of a prosecuting attorney during a trial generally cannot be made a ground of error unless the conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. State v. Papp (1978), 64 Ohio App.2d 203, citing with approval State v. Maurer (1984), 15 Ohio St.3d 239. Moreover, it has been held a trial court must afford the prosecutor some latitude and freedom of expression during argument. State v. Apanovich (1987), 33 Ohio St.3d 19; State v. Vrona (1988),47 Ohio App.3d 145. Therefore, a defendant shall be entitled to a new trial only when a prosecutor makes improper remarks and those remarks substantially prejudice the defendant. State v. Smith
(1984), 14 Ohio St.3d 13.
A perusal of the context in which the remarks in this case were made reveals the prosecutor was neither commenting on appellant's refusal to testify nor attempting to create an inference of guilt. Cf., State v. Saunders (1994), 98 Ohio App.3d 355; State v. Clark (1991), 74 Ohio App.3d 151; Rachel v.Bordenkircher (6th Cir., 1978), 590 F.2d 200.
Rather, the prosecutor sought merely to remind the jury that it was not necessary for the state to establish a possible motive for the crime in order to sustain its burden of proof. Such a statement is within the latitude accorded the prosecution during closing argument. State v. Clemons (1998), 82 Ohio St.3d 438;State v. Bies (1996), 74 Ohio St.3d 320; State v. Girts (1997)121 Ohio App.3d 539; see also, State v. McNeill (1998), 83 Ohio St.3d 438
at 447-448.
Appellant next challenges the prosecutors' conduct in discovery matters. Appellant argues each instance constituted a willful violation of the requirements of Crim.R. 16(B)(1). The record, however, does not support appellant's argument.
Appellant initially claims she was prejudiced by the prosecutors' failure to comply with the requirements of Crim.R. 16(B)(1)(e) as evidenced by the lack of an address and a telephone number for witness Michael White on the state's formal discovery document.
Crim.R. 16(B)(1)(e) requires a prosecutor to "furnish to the defendant a written list of the names and addresses of all witnesses whom [he] intends to call at trial." The transcript of proceedings in this case reveals that although the prosecutors furnished White's name, it was impossible for them to furnish White's address. White stated he was arrested prior to appellant's trial but then released from jail that same day; he thereafter essentially went into hiding. Thereafter, White's contact with the prosecutors was initiated only on White's terms. Therefore, there was no willful violation of discovery requirements.
Furthermore, a review of the transcript of proceedings reveals appellant's defense was not hindered by White's earlier unavailability. Indeed, appellant desired White's testimony at trial as evidenced by her counsel's comment in his opening statement:
 Now, it's anticipated that Mike White is going to come into this courtroom and he's going to take that witness stand. If [the prosecutors] don't call him, I will.
A similar conclusion is reached concerning appellant's assertion the prosecutors improperly failed to provide her with full information concerning Latimer's prior criminal record before calling Latimer as a witness. A review of the record reveals the prosecutors simply were unaware of any further information; they obviously were surprised when confronted by defense counsel's discovery that Latimer had a prior felony conviction. The trial court thereupon permitted defense counsel to question Latimer at length concerning the matter and further permitted defense counsel to recall Latimer as a witness for further cross-examination. Thus, no willful violation occurred and appellant suffered no prejudice as the result of the prosecutors' omission. See, e.g.,State v. Soke (1995), 105 Ohio App.3d 226.
Appellant also asserts the prosecutors failed to comply with discovery rules in the matter of written summaries of her statements made to police officers. The written summaries provided by the prosecutors, however, clearly set forth the fact that appellant made each of her oral statements in the presence of not one but several police officers.
Appellant's oral statements at the scene, moreover, all were consistent with each other; the statement she made on the following day contained more detail in response to issues raised as the result of the officers' continuing investigation of the incident and thus differed from her earlier statements. Defense counsel was aware of these discrepancies. Under the circumstances, the prosecutors' failure to separately summarize each statement appellant made to each police officer did not violate the requirements of Crim.R. 16(B)(1)(a)(ii). See, e.g., State v. Parson (1983), 6 Ohio St.3d 442
at 445; State v. Bidinost (1994), 71 Ohio St.3d 449 at 456-457; cf., State v. Moore (1988), 40 Ohio St.3d 63.
Appellant also challenges the prosecutors' conduct in introducing certain matters into evidence. She first asserts the evidence of her occupation was introduced in contravention of Evid.R. 404. That rule, however, is inapplicable.
Evid.R. 404 prohibits the introduction into evidence of "a person's character or a trait of [her] character" or "other crimes, wrong or acts" for the purpose only of proving that she "acted in conformity therewith." A review of the record reveals the prosecutors introduced appellant's occupation into evidence in order to place the relationship between appellant and the victim into perspective. Thus, it did not relate to appellant's "propensities." Since the evidence was introduced for an independent and permissible purpose, the prosecutors' actions were not improper. State v.Soke, supra.
Appellant also asserts the prosecutors compromised her right to a fair trial when they attempted to introduce evidence of the victim's dislike of firearms. A review of the transcript reveals defense counsel's objections to this line of questioning swiftly were sustained by the trial court. Furthermore, the trial court instructed the jury to disregard the testimony. Since a jury is presumed to follow the trial court's instructions, error, if any, was harmless beyond a reasonable doubt. See, e.g., Pang v. Minch
(1990), 53 Ohio St.3d 186; State v. Williams (1983), 6 Ohio St.3d 281.
For the foregoing reasons, appellant's first, second, third and fourth assignments of error are overruled.
Appellant's fifth assignment of error states:
 THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S RULE 29 MOTION AS THERE WAS INSUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE OFFENSE CHARGED BEYOND A REASONABLE DOUBT.
Appellant argues the state failed to sustain its burden to prove she committed the murder of the victim with "prior calculation and design." A review of the totality of the evidence renders appellant's argument unpersuasive.
This court is required to view the evidence adduced at trial in a light most favorable to the prosecution to determine if a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. State v. Dennis
(1997), 79 Ohio St.3d 421; State v. Jenks (1991), 61 Ohio St.3d 259.
In considering an argument such as appellant's, the test is whether the evidence "reveals the presence of sufficient time and opportunity for the planning of an act * * * and the circumstances * * * show a scheme designed to implement the calculated decision to kill * * *." State v. Cotton (1978), 56 Ohio St.2d 8, syllabus 3; see, also, State v. Moreland (1990), 50 Ohio St.3d 58; State v. Taylor (1997), 78 Ohio St.3d 15.
In this case, White testified that during the months previous to the murder, appellant sought to either purchase or trade her shotgun for a small gun in order to kill a girl. Appellant's neighbor heard someone firing a shotgun from the upstairs porch approximately two weeks prior to the murder. Appellant telephoned the victim the night before the murder; their conversation so disturbed the victim she refused to accept any additional contact from appellant at that time.
Nevertheless, the next morning, appellant persisted in her efforts to reach the victim in order to arrange the victim's visit to appellant's house. Approximately one-half hour before the incident, appellant, sounding "anxious," telephoned the victim's house to assure herself the victim was on her way. Prior to the victim's arrival, appellant loaded the shotgun, slipped a knife and a glove into her pocket, placed the shotgun inside the leg of her jeans, and then proceeded downstairs to meet the victim. Once in the driveway, appellant opened the car's passenger-side door, fired the shotgun, then closed the car's door before leaving the scene to relinquish the gun.
The foregoing evidence demonstrates appellant had ample time to plan and prepare the crime. Appellant then created the opportunity by luring the victim to her home. She loaded the gun, then disguised it in order to approach the unsuspecting victim. Appellant then shot the victim from a distance of only five to six feet.
Since the evidence indicates appellant made the necessary "studied analysis" of both her method and her plan of attack, sufficient evidence supported appellant's conviction for aggravated murder in violation of R.C. 2903.01(A). State v. Taylor, supra;State v. Claytor (1991), 61 Ohio St.3d 234 at 241; cf., State v.Richardson (1995), 103 Ohio App.3d 21; State v. Jenkins (1976),48 Ohio App.2d 99.
Accordingly, appellant's fifth assignment of error is overruled.
Appellant's sixth assignment of error states:
 THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
In this assignment of error, appellant cursorily argues her conviction is not supported by the weight of the evidence.
In State v. Thompkins (1997), 78 Ohio St.3d 380 at 387, the supreme court, citing State v. Martin (1983), 20 Ohio App.3d 172, set forth the test to be applied in considering this issue as follows:
 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences,
considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.")
(Emphasis added.)
A review of the entire record in this case demonstrates the testimony of the state's witnesses was both consistent and corroborated by the physical evidence. Appellant's statements as to how the incident occurred, on the other hand, were self-serving and also incredible.
The forensic tests proved the shotgun used in the killing could not be fired while being unloaded. Moreover, they proved the shotgun could not be fired without pumping a shell into the chamber as well as disengaging the safety. In other words, it was impossible for the killing to be an unintentional mishap.
There was competent, credible evidence that supported the jury's conclusion that appellant planned to kill the victim. Statev. Cotton, supra. Therefore, the verdict fails to indicate the jury lost its way and created a manifest miscarriage of justice.State v. Jenks, supra.
Accordingly, appellant's sixth assignment of error is overruled.
Appellant's seventh assignment of error states:
 CUMULATIVE ERRORS AT THE TRIAL COURT LEVEL DENIED THE APPELLANT HER CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
Appellant cites State v. DeMarco (1987), 31 Ohio St.3d 191 at 196-197 as authority supporting this assignment of error; however, in view of this court's disposition of appellant's first six assignments of error, appellant's seventh assignment of error lacks merit.
Appellant's seventh assignment of error, therefore, is overruled.
Appellant's conviction and sentence are affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TERRENCE O'DONNELL, P.J. and TIMOTHY E. McMONAGLE, J.CONCUR.
 _________________________________ KENNETH A. ROCCO, JUDGE
[1] Quotes indicate testimony given by a witness at appellant's trial.