JOURNAL ENTRY and OPINION
{¶ 1} Defendant-appellant Curtis Gregory appeals from his convictions after a jury trial on charges of aggravated burglary, and aggravated robbery, each with a one-year firearm specification, and of carrying a concealed weapon.
 {¶ 2} Appellant challenges his convictions on several grounds. He asserts the trial court erred in admitting certain hearsay and "character" testimony, in denying his motion for a mistrial based upon what he claims was the improper testimony of a witness, in refusing to order production of a witness' prior statement, and in rejecting his request for a special jury instruction. He additionally asserts his convictions are supported by insufficient evidence.
 {¶ 3} Following a thorough review of the record, however, this court cannot find any of his challenges to have merit. Consequently, appellant's convictions are affirmed.
 {¶ 4} Appellant's convictions stem from an incident that occurred on June 9, 2003, but which had been precipitated by an earlier event. In late May, Richard Horvath III, known by his nickname "Li'l Ritchie" to distinguish him from his father Richard Horvath Senior, had stolen a suitcase full of money from his long-time friend, an alleged drug-dealer named Jarrett Doss.
 {¶ 5} Li'l Ritchie had taken the money as the opportunity to do so had presented itself. He had known Doss since they attended junior high school in Virginia together, and Doss was sheltering him in the spring of 2003. Li'l Ritchie, however, in December 2002 had spoken to a federal Drug Enforcement Agency ("DEA") representative in Virginia about Doss' illegal activities; thus, Li'l Ritchie realized Doss was suspicious of him and that he was in danger if Doss discovered the betrayal.
 {¶ 6} Li'l Ritchie fled with the money from Atlanta, where he had been staying with Doss, to Cleveland, where his father and aunt Crystal Szell lived. Upon his arrival in this area, he began a spending spree. Li'l Ritchie's carelessness attracted attention and enabled Doss to learn of it by contacting people in the Cleveland area whom he knew through Li'l Ritchie.
 {¶ 7} One of these people was Michael Saler. Saler was close to the Horvath family: he had been working for Szell, and he was the brother of Terry Butcher, who for years had been Li'l Ritchie's father's girlfriend. On the evening of June 7, 2003 Saler was walking Butcher from her apartment to his car when they were accosted from behind by several men. One of the men placed his arm around Saler's neck, and the "next thing [he knew], [he's] laying on the floor of a van with a gun shoved in [his] mouth." While Saler and Butcher were helpless, they were told by their assailants that "Ritch stole some money," that the men were "up here looking for him, and they [were] going to find him and anybody with him is going to get whacked."
 {¶ 8} Although the assailants quickly left, Saler received a telephone call from Doss the following morning. Saler agreed with Doss that, in exchange for his own and Butcher's safety, he would cooperate with Doss' men in their search for Li'l Ritchie. Saler was instructed to meet with Doss' men the next day at a motel near the airport.
 {¶ 9} Saler arrived at the motel at the appointed time on June 9, 2003 and proceeded to the room number he had been given. Once in the room, he saw four men loading cartridges into guns. The men placed the guns into the waistbands of their pants before covering them with their shirts. Saler later identified the men as appellant Curtis Gregory, and co-defendants Carl West, Quentin Pinchback, and Rontae Perkins. Perkins seemed to be the leader.
 {¶ 10} As ordered, Saler drove the men's van for them around the neighborhoods Li'l Ritchie could be found. He stopped once during the excursion, because Perkins stated they "needed some duct tape and some rope." After Perkins had obtained the items, Richard Horvath Senior passed the van in the opposite direction. Li'l Ritchie's father was known to Doss' men, so the sighting of him lent credence to Saler's cooperation. Saler returned the men to the motel, and was ordered to come back in two hours.
 {¶ 11} Saler obeyed at approximately 4:00 p.m. While he remained seated in his car in the motel parking lot, the van was driven near, and the men exited it to speak with him. Perkins informed him the "plan" was to "get into [Szell's] house," so they could "tie up" Szell and by these means force Li'l Ritchie to come to them there. Saler believed he would have no trouble gaining admission, since he and Szell were acquainted. He told the men to follow him to her condominium.
 {¶ 12} Upon their arrival in the neighborhood, the men waited in the van while Saler went to Szell's home by himself to "scout" the situation. Although Szell admitted Saler, she told him she and her daughter, fourteen-year old "T," were leaving soon to eat out. Thus, after a short visit, Saler left at the same time the two females did.
 {¶ 13} Saler proceeded to meet with Doss' men in a nearby parking lot. He told them Szell's home currently was empty and where she kept a spare key. Perkins decided to take advantage of this development; he instructed Saler to drive the van, drop them off at Szell's, then return for them upon his signal. Saler obeyed.
 {¶ 14} After a time, however, Szell arrived back at her home to retrieve some videotapes she wanted to return. T volunteered to go inside for them while Szell waited in the car.
 {¶ 15} T entered through the garage to find the hallway strewn with papers and clothing. When she looked into the first room on her way into the home, she saw a man she later identified as co-defendant Pinchback. He stood against the dryer, arms crossed, with a gun in one of his hands. Pinchback glanced in her direction; when his eyes met with T's, she turned and fled out the garage door.
 {¶ 16} T ran into the driveway screaming, "They have guns!" Szell, hearing the screams, exited the car, but she remained unsure of what was occurring, so she simply stood in the driveway while T continued her flight to a neighbor's nearby condominium to telephone the police. Thus, Szell was in a position to see when two men ran out of her home. She later identified the men as co-defendants Pinchback and Carl West.
 {¶ 17} Seeing Szell close by, West pointed the gun he carried wrapped in a white towel at her. He pushed it into her stomach and ordered her to get inside. Szell put her hands up but began backing away from the weapon. T observed this from the window of the neighbor's; T further saw Pinchback glancing around as if searching for someone.
 {¶ 18} Saler had by this time received the summons to return for Doss' men. He approached Szell's home to see the men running toward the van "from everywhere." When he came near, one jumped into the rear passenger seat while the other opened the sliding door; Pinchback and West also leapt inside. The men urged Saler to "go, go, go." As Saler pulled away, he saw Szell, obviously agitated, standing in her driveway with her cellular telephone in hand
 {¶ 19} Saler's subsequent efforts to elude the police proved futile. Within a short time, he was forced to stop the van, and, although all the men inside attempted to flee on foot, all were captured by local police officers.
 {¶ 20} Within a week, appellant, Perkins, West, Gregory, and Saler were together indicted on a total of twenty counts. Twelve of them pertained to appellant, viz., two counts of conspiracy to commit aggravated murder, two counts of kidnapping, two counts of aggravated burglary, two counts of aggravated robbery, two counts of felonious assault, one count of failure to comply with the signal or order of a police officer, and one count of carrying a concealed weapon; all except the latter two counts contained both a three-year and a one-year firearm specification.
 {¶ 21} Saler eventually entered into a plea agreement with the state and testified as a prosecution witness at the jury trial of his co-defendants. Among many others, the state additionally presented as witnesses the Horvaths, Szell, T, Butcher, some of the police officers involved, and an agent of the Federal Bureau of Investigation ("FBI").
 {¶ 22} The jury ultimately found appellant guilty of two counts of aggravated burglary, two counts of aggravated robbery, and one count of carrying a concealed weapon. He received a total sentence of four years for these convictions.
 {¶ 23} Appellant appeals his convictions by presenting six assignments of error for review. His first, third and fourth are related, therefore, they are addressed together as follows:
 {¶ 24} "I. The court erred by admitting the hearsay statements of a non-testifying defendant, which violated the defendant's (sic) confrontational rights and also the hearsay rule."
 {¶ 25} "III. The appellant was deprived of due process by the court's failure to require the state to produce statements made by the witness Richard Horvath, III to the DEA."
 {¶ 26} "IV. The defendant was denied due process and a fair trial by allowing the prosecutor to introduce testimony which violated Ohio Evidence Rule 404(A)."
 {¶ 27} In these assignments of error, appellant challenges certain evidentiary rulings made by the trial court. However, the trial court's decisions to admit or to exclude evidence are reviewed pursuant to an abuse of discretion standard. State v.Soke (1995), 105 Ohio App.3d 226. A review of the record of this case fails to support a conclusion any abuses of discretion occurred.
 {¶ 28} Appellant first asserts the trial court compromised the fairness of the jury's determination of his guilt by permitting the FBI agent to describe the story co-defendant Pinchback gave during his oral statement. Appellant claims the testimony constituted impermissible hearsay by a "co-conspirator." Appellant's first assertion cannot be credited.
 {¶ 29} The record reveals the trial court instructed the FBI agent that none of Pinchback's co-defendants was to be mentioned by name, and the agent complied with this instruction. This action was consistent with the United States Supreme Court's decision in Richardson v. Marsh (1987), 481 U.S. 200. The co-defendant's statement thereby was "redacted" to the point of neither naming nor reasonably implicating appellant; consequently, the trial court did not act improperly in admitting the FBI agent's testimony. State v. White (Apr. 16, 1998), Cuyahoga App. No. 72011.
 {¶ 30} Appellant further asserts the trial court erred in denying his request for an order to the Virginia DEA agent to produce any of Li'l Ritchie's December 2002 statements. Appellant suggests he could have used Li'l Ritchie's statements for impeachment purposes.
 {¶ 31} The record reflects Li'l Ritchie testified that he met with a DEA agent based in Virginia, informed the agent of Doss's illegal activities, and named certain individuals with whom Doss associated, but, by the time of trial, could not recall any of the names he provided. At that point, the defense attorneys requested the court to halt the proceedings and to issue an order to the DEA to produce the statements. The trial court declined.
 {¶ 32} This court cannot determine that decision constituted an abuse of discretion for several reasons. First, the statements were not in the custody of the prosecutor, thus, it was impossible for the court to determine when, or even if, the statements would be produced. Moreover, even if they had been available, the statements were of both questionable relevance and admissibility pursuant to the Ohio Rules of Evidence. Finally, the record reflects L'il Ritchie extensively and thoroughly was cross-examined by each of the four defense counsel; under the circumstances, further impeachment of his testimony was unnecessary.
 {¶ 33} In his fourth assignment of error, appellant asserts the trial court improperly permitted Li'l Ritchie during his testimony, simply by an implied association with Doss, to portray appellant as a "bad character." This assertion is rejected. Li'l Ritchie explained why he was afraid of Doss. Since he made no mention of a fear of any other individual, including appellant, his testimony did not violate Evid.R. 404(A).
 {¶ 34} For the foregoing reasons, appellant's first, third and fourth assignments of error are overruled.
 {¶ 35} Appellant's second, fifth and sixth assignments of error state:
 {¶ 36} "II. The court erred when it denied the defendant's motion for a mistrial."
 {¶ 37} "V. The evidence on the basis of which the defendant was convicted was insufficient to support any findings of guilt beyond a reasonable doubt."
 {¶ 38} "VI. The court erred, or abused its discretion, when it refused to give the defendant's requested instruction on `mere presence.'"
 {¶ 39} Appellant argues reversible error occurred when the FBI agent testified as to the reason he became involved in the investigation following the arrests of appellant and his co-defendants. Appellant also argues his convictions are unsupported by sufficient evidence of guilt. Additionally, appellant argues the trial court acted improperly in declining to give the jury a special instruction he requested.
 {¶ 40} However, none of the foregoing arguments is supported by appellant with any citation to specific legal authority. Pursuant to App. R. 12(A)(2) and 16(A)(7), therefore, this court declines to address them.
 {¶ 41} Accordingly, appellant's second, fifth and sixth assignments of error are overruled.
 {¶ 42} Appellant's convictions are affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Corrigan, A.J. and James J. Sweeney, J. Concur.