[Cite as *State v. Daniels*, 2016-Ohio-7299.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103663**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# DIONDREY DANIELS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-591054-D

**BEFORE:** Blackmon, J., Kilbane, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** October 13, 2016

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1360 East 9th Street
Suite 600
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Stephanie N. Hall
Assistant County Prosecutor
9th Floor Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1} Diondrey Daniels ("Daniels") appeals his felony convictions stemming from the armed robbery of Dennis Keaton ("the victim") and assigns the following errors for our review:

> I. The trial court erred by entering convictions which were against the manifest weight of the evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.
>
> II. The trial court erred by admitting evidence that the alleged victim was threatened by the family of a co-defendant, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.
>
> III. The trial court erred by excluding evidence which supported the Defendant's contention that the alleged victim had misidentified him as being one of the perpetrators of the crimes, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

{¶2} On the night of September 13, 2014, the victim was unloading groceries at his apartment on Spruce Court in Cleveland, when he noticed four males "hanging out in the hallway" on the second floor of the building. He "knew their faces from the community," but did not know their names. After unloading his groceries, the victim moved his car, and when he came back to his apartment building, he did not see the males that had been standing there. However, as the victim walked up the stairs to his apartment, he "saw a guy standing off to the side as if he was [urinating]. He was wearing an all-gray hoodie, and he was standing with his back towards me, turned away from me."

**{¶3}** The victim looked at the man again,

> and it clicked that, you know, the guy was about to rob me. I looked at my door and I said I'm not going to make it in time, so I stood there; and as I stood there, he brandished a gun. As he brandished it, I grabbed him and I said, no, and we started tussling with the gun and he, you know, led me up to the landing where my doorway was.
>
> We were * * * fighting our way up as we are tussling with the gun. He was kind of in control, and I was just saying no as we [were] fighting with the gun, and we went up the stairs. As we came up the stairs, I saw * * * Daniels coming down the stairs with another gun, and he was telling me to stop tussling or he was going to shoot me.

Tr. 1730.

**{¶4}** Although the victim did not know the names of the offenders at the time of the robbery, he subsequently identified Daniels from a photo lineup as the man who came down the stairs with a gun and codefendant Michael McQueen ("McQueen") as the man in the gray hoodie with whom he "tussled." According to Daniels, two other men were also part of the robbery, and he later identified them as codefendants Tiant Padgette ("Padgette") and Dionta Willis ("Willis").

**{¶5}** When they reached the hallway, McQueen hit the victim across the face with the gun and put the gun in the victim's mouth, then under his chin. The men took the victim's wallet, which contained $200 and his disability cards, and ordered him to open his apartment door. The victim stated that he did not have a key. Daniels told McQueen to shoot the victim. The victim's girlfriend opened the door to their apartment, and the men "fell inside the door." According to the victim and his girlfriend, Teria

Thompson ("Thompson"), Daniels fired his gun into the apartment and McQueen's gun misfired. After this, the men "took off running."

{¶6} Thompson called 911. The victim got on the phone and told the dispatcher that three men robbed him and they all had guns. The police arrived and recovered a .22-caliber shell casing on the floor in the entrance to the victim's apartment and a .45 caliber magazine outside of the apartment door. Additionally, there was a bullet hole in the kitchen wall.

{¶7} The police gave the victim four photo lineups on three separate occasions between September 19 and October 30, 2014, and the victim identified the four codefendants in this case. On November 24, 2014, Daniels, Padgette, Willis, and McQueen were indicted for kidnapping, aggravated robbery, felonious assault, and improperly discharging a firearm, with gun specifications. The case went to trial, and on June 17, 2015, the jury acquitted McQueen and Padgette on some of the counts and was hung on the remainder of the counts against McQueen and Padgette and all of the counts against Willis and Daniels. The court declared a mistrial on the undecided counts.

{¶8} In August 2015, McQueen, Padgette, and Willis entered guilty pleas. Daniels went to trial for the second time, and on August 28, 2015, a jury found him guilty of all counts. The court subsequently sentenced him to six years in prison.

## Manifest Weight of the Evidence

**{¶9}** In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶10} An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case that the evidence weighs heavily against the conviction." *Id.*

{¶11} On appeal, Daniels argues that there was no evidence linking him to the crime other than the victim's testimony identifying Daniels as the male who shot into his apartment. Specifically, Daniels argues that the victim's testimony was inconsistent as to how many men were involved, and the victim "could not distinguish between Mr. Daniels and his cousin Demonte [sic]."

{¶12} The victim testified that he "knew [Daniels] from his brothers in the community," and that he had purchased marijuana from Daniels's and McQueen's family members. According to the victim, he recognized the four males' faces, but did not know their names. Asked why he initially reported three men, rather than four, the victim stated he "was confused and afraid" during the 911 call. He had "the community help with the names," and learned some of their "government" names and some of their "nicknames." Ultimately, he gave the following names to the police: Little Mikey, Little Dudi, Mr. Willis, and Teon. The victim further stated that Mr. Willis's first name was Dionta. The victim also told police that he believed a man named Joshua Jones set up the robbery.

{¶13} In March 2015, the victim was contacted by a private investigator ("the PI") who worked for Daniels's defense attorneys. The PI met with the victim three times and showed him a number of photographs on her cell phone. Most of the photographs were of the defendants, and the victim identified them as such. However, on the PI's third visit with the victim, she showed him one picture of Daniels's cousin Demont, who is one year older than Daniels. The two bear a resemblance to each other. On this occasion, the victim identified Demont as one of the men who robbed him. Asked why the PI came back twice after the victim identified Daniels, the victim testified that "I guess she wasn't satisfied with me saying — she wanted me I guess to say it was somebody else." The victim further testified that at one point, he "changed whether [he] had the right name of the perpetrator in this case against [Daniels]," because he was afraid of Daniels's family.

{¶14} The victim picked Daniels out of a photo array, and during his testimony, made an in-court identification of Daniels as the man who fired the gun into his apartment on the night in question. Asked the following question: "How certain are you, Mr. Keaton, that Diondrey Daniels, the individual sitting at the table here, was the male that robbed you and shot into your home?" — the victim answered "100 percent."

{¶15} Thompson was living with the victim on Spruce Court when the robbery occurred, and she observed the events in the hallway when she opened the apartment door. Thompson's testimony corroborates the victim's testimony, other than she recalled seeing two men (in addition to the victim) in the hallway and a third man running from the scene. Thompson testified that both males with guns tried to shoot into the

apartment, "[a]nd one actually succeeded, which went through the kitchen wall. * * * The one that turned the corner physically shot. The one that was wrestling with [the victim] couldn't get the shot, because he dropped his clip." The police came and talked to her and the victim about the events that occurred that night. She never gave the police a detailed description of the males nor did she know their names. "I didn't know none of the guys. I didn't care to."

{¶16} Ohio courts have held that "even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible." *State v. Jordan*, 10th Dist. Franklin No. 04AP-827, 2005-Ohio-3790, ¶ 14. *See also State v. Bryson*, 8th Dist. Cuyahoga No. 98298, 2013-Ohio-934. Therefore, credible eyewitness identification testimony is enough to withstand a challenge to the weight of the evidence in favor of a conviction. It is well-settled law that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts" to consider. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

{¶17} Upon review, we cannot say that the jury lost its way in convicting Daniels based on the victim's identification of him. Accordingly, Daniels's first assigned error is overruled.

### Admissibility of Evidence

{¶18} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). "Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

### Threats

{¶19} Daniels argues in his second assigned error that the victim's testimony about threats made by codefendants and their family members "offered no evidence of any connection between the supposed threats and Mr. Daniels." The victim testified about being threatened and harassed by many people, some of whom were Daniels's family members. Other testimony, however, concerned threats made to the victim by codefendant McQueen and members of his family. For example, over defense counsel's objection, the victim testified that he called 911 after McQueen came to the victim's apartment demanding the victim return the magazine clip from McQueen's gun.

{¶20} This court has held that "[p]recedent overwhelmingly supports the conclusion that 911 calls are admissible either as excited utterances or present sense impressions." *State v. Rose*, 8th Dist. Cuyahoga No. 89457, 2008-Ohio-1262, ¶ 42. Statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" are admissible as present sense impressions. Evid.R. 803(1). Furthermore, statements "relating to a startling

event or condition made while the declarant was under the stress of excitement caused by the event or condition" are admissible as excited utterances. Evid.R. 803(2). Additionally, "evidence of threats or intimidation of witnesses reflect[s] a consciousness of guilt and [is] admissible as admission by conduct." *State v. Soke*, 105 Ohio App.3d 226, 250, 663 N.E.2d 986 (8th Dist.1995).

**{¶21}** Daniels first argues that the 911 call was not an excited utterance or a present sense impression in that "there was nothing contemporaneous about [the victim's] testimony about the threats. They occurred, if at all, many months before the trial." A plain reading of Evid.R. 803(1) and (2) shows that Daniels is misinterpreting the law.

**{¶22}** The victim testified that he called 911 on September 15, 2014, after McQueen "came back with the gun and was asking for the clip back to the other gun." In other words, the victim made the 911 call immediately after a man threatened him with a gun. In considering the lapse of time between the event and the declaration, we find that the victim's statements to the 911 dispatcher are admissible as excited utterances or present sense impressions. "There is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought." (Emphasis deleted.) *State v. Taylor*, 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (1993). The date that a witness testifies at trial is irrelevant to the admissibility of excited utterances and present sense impressions. Indeed, all out-of-court statements, properly or improperly admitted at a trial, will necessarily be made prior to the trial itself.

{¶23} Daniels next argues about the relevancy to his trial of threats made by a codefendant and his family. In overruling Daniels's objection to this evidence, the court stated as follows:

> I'm going to permit [this line of questioning] on the basis that, as I understand it, [the victim's] testimony all along has been that these were individuals who were known to him by sight and that they were people who were out and about in that section of the projects.
>
> * * *
>
> To the extent that the issue here is identification and who were these people, I think this evidence tends to support that he would have seen them and would have known them. On that basis, I'm going to allow this line of questioning. There may be particular things that might be objectionable within that line of questioning; but as an overall matter, I'm going to permit it.
>
> Now, I'm not letting it in specifically for the purpose of buttressing [the victim's] credibility, but it does provide a context for how he made these identifications when reporting the matter to the police.

{¶24} Thompson testified that, on the night of the robbery, she and her young son were leaving the apartment when they were confronted in the hallway by members of Daniels's and McQueen's families. They were "waiting outside the apartment * * * trying to make [the victim and Thompson] not say who robbed" the victim. The victim called 911 again. The defendants' family members stayed in the hallway until the police arrived. The next morning, on September 14, 2014, McQueen came back to the victim's apartment. According to the victim, he called the police several times because of "constant threats, harassment" by the defendants.

{¶25} After the victim identified Daniels, he was contacted "several times" in person and on the phone by Daniels's brothers Rodney and Darren, and Daniels's sister

Tara.  Additionally, Thompson testified that she called the police "numerous times" after this incident, because "[p]eople were waiting outside."  On more than one occasion, Thompson got a police escort to her vehicle so she and her son could leave for the night. Several 911 audio tapes were played for the jury.  In one of them, for example, Thompson told the dispatcher that "one of the guys that was involved in the robbery is swarming outside of my building."  In October 2014, the victim and his girlfriend moved from Spruce Court because they were "constantly being harassed and threatened by the assailants' families," and "it wasn't safe to stay" there.

{¶26} Upon review, we find that the court did not abuse its discretion in admitting evidence of threats by Daniels and his codefendants.  Daniels's second assigned error is overruled.

### Misidentification

{¶27} In Daniels's third and final assigned error, he argues that the court abused its discretion when it excluded the admission of two photographs – one of Daniels and one of his cousin Demont — during Daniels's sister Tara's testimony.  Specifically, Daniels argues that the pictures' "exclusion prevented [him] from fully presenting his case of misidentification."

{¶28} Tara testified that, between January and March 2015, she texted back and forth with the victim, including sending a picture of her brother, Daniels, and a picture of her nephew, Demont.  On cross-examination, Tara testified that she got the pictures from Facebook or Instagram using her phone, although she did not know who took them or when they were taken.  Tara further testified that she did not provide these pictures, or

any other pictures, to the police. Tara identified these photographs during her testimony, although the court did not allow these exhibits to be admitted into evidence. It is unclear from the record whether the jury saw these photographs.

{¶29} The United States Supreme Court has held that "due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Moore v. Illinois*, 434 U.S. 220, 227, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977). This constitutional protection applies to pretrial confrontations for the purpose of identification, and includes photo arrays or lineups and one-on-one presentations of the accused conducted by law enforcement. *Id.* at 229. We could find no case factually on point with the situation at hand — where the defendant's family member shows the victim a picture of the defendant and a picture of the defendant's cousin and suggests that the two men look alike. Additionally, we are aware that the defendant is the party who is requesting that this evidence be admitted. Nonetheless, upon review, we find this to be an "unnecessarily suggestive procedure," which may "give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U.S.*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The jury heard testimony regarding these photographs and Daniels's theory of misidentification, but ultimately the court determined these photographs were "unnecessarily suggestive." Accordingly, the court's excluding these photographs from jury deliberations was not an abuse of its discretion, and Daniels's final assigned error is overruled.

{¶30} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE
MARY EILEEN KILBANE, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR